# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

AMWAY GLOBAL,

      Petitioner,

v.

ORRIN WOODWARD, LAURIE WOODWARD,
CHRIS BRADY, TERRI BRADY, TIM MARKS,
and AMY MARKS,

      Respondents.

_____/

Case No. 09-12946

Hon. Gerald E. Rosen

## OPINION AND ORDER REGARDING
## CROSS-MOTIONS TO CONFIRM OR VACATE ARBITRATION AWARD

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on_____September 30, 2010_____

PRESENT:  Honorable Gerald E. Rosen
                Chief Judge, United States District Court

## I.  INTRODUCTION

Petitioner Amway Global commenced this action on July 24, 2009, seeking

confirmation of an interim arbitration award entered earlier that same day by arbitrator

Linda R. Singer.  In this interim award, as subsequently restated in an August 7, 2009

final award, the arbitrator determined (i) that Respondents Orrin and Laurie Woodward

were liable to Petitioner in the amount of $12,736,659, (ii) that Respondents Chris and

Terri Brady were liable to Petitioner in the amount of $9,578,756, and (iii) that

Respondents Tim and Amy Marks were liable to Petitioner in the amount of $3,533,230. Petitioner has moved for an order confirming this award under § 9 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 9, and Respondents, in turn, have moved to vacate the arbitrator's award under § 10 of the FAA, 9 U.S.C. § 10, as well as on the threshold ground that the parties' disputes were not arbitrable. This Court's subject matter jurisdiction rests upon the diverse citizenship of the parties. *See* 28 U.S.C. § 1332(a).

The parties' cross-motions to confirm or vacate the arbitrator's award have been fully (and extensively) briefed. Having reviewed the parties' lengthy written submissions and accompanying (and voluminous) exhibits, and having gained considerable familiarity with the issues raised in the present motions by virtue of having presided over an earlier suit involving the same parties, *see Quixtar Inc. v. Brady,* No. 08-14346, 2008 WL 5386774 (E.D. Mich. Dec. 17, 2008), the Court finds that the relevant allegations, facts, and legal arguments are adequately presented in the parties' briefs and supporting materials, and that oral argument would not aid the decisional process. Accordingly, the Court will decide the parties' cross-motions "on the briefs." *See* Local Rule 7.1(f)(2), U.S. District Court, Eastern District of Michigan. This opinion sets forth the Court's rulings on these motions.

## II. <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

### A.    The Parties

Petitioner Amway Global is a Virginia corporation with its headquarters in Ada, Michigan. Petitioner sells health and beauty products, and is the successor in interest to

Quixtar Inc. (the petitioner in the prior suit before this court) and the original Amway Corporation. Petitioner sells its products through a network of hundreds of thousands of individuals referred to as Independent Business Owners ("IBOs"). Respondents Orrin and Laurie Woodward, Chris and Terri Brady, and Tim and Amy Marks are Florida residents and former Amway IBOs.

**B.      The Underlying Arbitration Proceedings**

In August of 2007, Petitioner terminated each of the Respondents as IBOs and commenced arbitration proceedings against them, along with several other former IBOs. In this arbitration, Petitioner asserted breach of contract and tortious interference claims against Respondents, arising from their alleged violation of contractual prohibitions against soliciting other IBOs to compete against Petitioner.

These arbitration proceedings were interrupted and delayed by a number of trips to courts across the country. As this Court observed in an earlier suit involving Petitioner, Respondents, and other former Amway IBOs, "[i]t would scarcely be possible to recount" all of the disputes between Petitioner and its IBOs that have ended up in court, but it "[s]uffice[s] . . . to say that these parties have proven to be extremely litigious." *Quixtar*, 2008 WL 5386774, at *1; *see also id.* at *2-*3 (summarizing this procedural history).[1] Indeed, the prior suit before this Court was part of this series of detours from

---

[1]Further confirmation of the extent and scope of the parties' various court challenges can be found in the 145-page brief that Respondents initially submitted in support of their motion to vacate the arbitrator's award. Roughly twenty (20) pages of this brief were devoted to recounting the various lawsuits thought to be relevant here. By order dated November 24, 2009,

the arbitration proceedings, with Petitioner seeking an order compelling Respondents to return to arbitration, and Respondents requesting, among other relief, that the Court abstain in favor of ongoing Georgia state court proceedings. The Court concluded that Respondents were seeking, in essence, interlocutory review of an arbitrator's rulings in an ongoing arbitration proceeding, and it held that the arbitration should proceed to its conclusion without further judicial intervention. *See id.* at *14-*15. The Sixth Circuit affirmed this ruling on appeal. *See Quixtar, Inc. v. Brady,* No. 08-2629, 328 F. App'x 317 (6th Cir. Apr. 30, 2009).

Upon the parties' return to arbitration, Petitioner settled its claims against certain of its former IBOs, and motion practice led to the narrowing of Petitioner's claims against Respondents. Following a hearing spanning from May 5, 2009 to June 4, 2009, the arbitrator issued an interim award on July 24, 2009, holding Respondents Orrin and Laurie Woodward liable to Petitioner in the amount of $12,736,659, holding Respondents Chris and Terri Brady liable to Petitioner in the amount of $9,578,756, and holding Respondents Tim and Amy Marks liable to Petitioner in the amount of $3,533,230. (*See* Petitioner's Motion, Ex. 1-A, Interim Award at 6.)[2] The arbitrator then restated these awards in an August 7, 2009 final award. (*See* Petitioner's Motion, Ex. 1,

---

the Court denied Respondents' request for leave to file this 145-page brief, and instead limited them to a 50-page brief.

[2]The arbitrator confirmed in this interim award that the claims against all other parties had been settled or dismissed.

4

Final Award.)  Petitioner now requests that this award be confirmed, while Respondents

seek to vacate the award on a number of grounds.

## III.  ANALYSIS

### A.  There Is No Basis for Disturbing the Arbitrator's Rulings on Arbitrability Under the Deferential Standard That Governs This Court's Review.

Apart from deciding Petitioner's substantive claims against Respondents, the

arbitrator also was called upon to rule on a number of threshold questions of arbitrability.

In particular, in a pair of motions filed on February 22, 2008, Respondents requested that

the arbitrator dismiss the arbitration proceeding, arguing (i) that the agreement giving rise

to the arbitration was unenforceable on a number of grounds, and (ii) that, even if this

agreement might be enforceable in some instances, the specific claims asserted by

Petitioner against Respondents were not subject to arbitration.  Following a hearing, the

arbitrator denied these motions in an April 1, 2008 order.

In their pending motion to vacate the arbitrator's award, Respondents seek to

reassert these arbitrability challenges that they advanced in the course of the arbitration

proceedings.  As the parties recognize, the viability of these challenges turns, to a

considerable extent, upon the standard of review that the Court elects to apply in

resolving these threshold questions of arbitrability.  Accordingly, the Court turns first to

this question.

**1.      The Arbitrator's Rulings on Arbitrability Are Subject to Deferential Review.**

In the earlier case brought by Petitioner against Respondents and other former Amway IBOs, the Court and the parties extensively addressed the question whether Respondents had waived their opportunity for independent judicial review of the question of arbitrability by submitting this matter for determination by the arbitrator.  *See Quixtar,* 2008 WL 5386774, at *9-*13.  The principal focus of this discussion was the Sixth Circuit's decision in *Cleveland Electric Illuminating Co. v. Utility Workers Union, Local 270,* 440 F.3d 809, 813 (6th Cir. 2006), in which the court held that plaintiff Cleveland Electric had waived its opportunity for independent judicial review of the issue of arbitrability by "submitt[ing] the question of arbitrability to the arbitrator for his determination" without any indication that it "wanted to reserve the question of arbitrability for the court."

Upon considering the ruling in *Cleveland Electric* in light of the arbitrability challenges Respondents had submitted for the arbitrator's determination, this Court opined that "it would appear that Respondents did not sufficiently preserve their opportunity to have a court decide the question of arbitrability."  *Quixtar,* 2008 WL 5386774, at *11.  The Court explained:

> In their motion to dismiss filed with the arbitrator, Respondents did not separately and discretely "argue that the arbitrator had no authority to decide the issue of arbitrability."  *Cleveland Electric,* 440 F.3d at 811.  To the contrary, in the brief in support of their motion to dismiss, Respondents cited [Petitioner's] own Rules of Conduct as conferring upon the arbitrator

the authority to "resolve disputes about the interpretation and applicability of these Rules," and they argued that the arbitrator was obliged to use this authority to make "[a]n early determination of the[] pivotal legal issues" that, in their view, would lead to "a dismissal of all claims." ([Case No. 08-14346, Dkt. No. 40], Ex. E, Respondents' Br. in Support of Motion to Dismiss at 1 (quoting Quixtar Rule of Conduct 11.5.4).)  Among the "pivotal legal issues" identified in Respondents' motion was their claim that their disputes with [Petitioner] were not arbitrable because the arbitration provisions in [Petitioner's] Rules of Conduct were "unenforceable as a matter of law."  (*Id.*)  Just as in *Cleveland Electric,* then, it appears that Respondents "submitted the issue of arbitrability to the arbitrator for h[er] consideration," without separately "argu[ing] that the arbitrator had no authority to decide the issue of arbitrability."  *Cleveland Electric,* 440 F.3d at 811.  The Sixth Circuit found a waiver under these circumstances, and nothing in Respondents' submission to the arbitrator appears to warrant a different result here.

*Quixtar,* 2008 WL 5386774, at *11.

Nonetheless, this Court recognized that "*Cleveland Electric* is distinguishable in at least one respect":

In that case, the court observed that "Cleveland Electric raised the issue of who should decide arbitrability for the first time in its brief to the district court," a brief filed ***after*** the arbitration had concluded.  *Cleveland Electric,* 440 F.3d at 812.  Here, in contrast, at least some of the Respondents presented the question of arbitrability to a court ***before*** the JAMS Arbitration had begun, seeking a declaration in [a suit brought in a California federal district court] that [Petitioner's] agreements with its IBOs — including their arbitration provisions — were unlawful and unenforceable.  As the Sixth Circuit has explained, a party retains its right to a judicial resolution of the question of arbitrability if it "reserv[es] the question for initial determination by the court," typically in "an action to compel or enjoin arbitration."  *Vic Wertz Distributing Co. v. Teamsters Local 1038,* 898 F.2d 1136, 1140 (6th Cir. 1990).

The difficulty here, however, is that Respondents — or, more accurately, some of them — sought ***but did not obtain*** an "initial determination by the court" as to the arbitrability of their dispute with

> Quixtar. The federal district court in California elected to abstain, and thus
> did not address Respondents' challenge to arbitrability on the merits.
> Following this ruling, Respondents did not pursue the matter any further in
> court, but instead submitted their challenge to arbitrability for the arbitrator
> to decide. While this perhaps could be more accurately characterized as an
> "abandonment" of Respondents' opportunity to have a court decide the
> issue of arbitrability, and not a "waiver," the legal effect surely is precisely
> the same, and Respondents have not cited any authority that might suggest
> otherwise.

*Quixtar,* 2008 WL 5386774, at *12. Likewise, in its decision on appeal from this Court's

ruling, the Sixth Circuit concurred in this Court's conclusion that "Respondents

abandoned their efforts to secure a judicial determination of arbitrability and submitted

this issue to the arbitrator." *Quixtar,* 328 F. App'x at 322 (internal quotation marks and

citation omitted).

Yet, while this earlier discussion is instructive here, this Court expressly

acknowledged that it was dicta. Specifically, the Court observed that "the issue of waiver

[wa]s not yet ripe for decision" while the parties remained in arbitration, and emphasized

that it "need not (and does not) decide what issues have been preserved for judicial

review at the conclusion of the JAMS Arbitration, nor what standards should govern any

such review." *Quixtar,* 2008 WL 5386774, at *13 n.21. Similarly, the Sixth Circuit

recognized that "[b]ecause the District Court declined to make any determination on the

issue of waiver, there is no decision for this Court to review." *Quixtar,* 328 F. App'x at

322. Accordingly, in the absence of any prior "law of the case" on this issue, the Court

must now determine the standard that governs its review of the arbitrator's decisions on

matters of arbitrability.

With this renewed opportunity to review the record and consider the pertinent case law, the Court no longer views the issues of waiver and abandonment as controlling here. Rather, the Court views the "standard of review" question as governed by the more general principles of contract law addressed by the Supreme Court in *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 115 S. Ct. 1920 (1995). This Court extensively surveyed the *First Options* decision in the earlier suit brought by Petitioner, and this discussion bears repeating here:

> In [*First Options*], the Court considered "how a district court should review an arbitrator's decision that the parties agreed to arbitrate a dispute," and reasoned that this question, in turn, depended upon whether the parties "agree[d] to submit the arbitrability question itself to arbitration." *First Options,* 514 U.S. at 940, 943, 115 S. Ct. at 1922-23. "If so, then the court's standard for reviewing the arbitrator's decision about [arbitrability] should not differ from the [deferential] standard courts apply when they review any other matter that parties have agreed to arbitrate." 514 U.S. at 943, 115 S. Ct. at 1923. "If, on the other hand, the parties did *not* agree to submit the arbitrability question itself to arbitration, then the court should decide that question just as it would decide any other question that the parties did not submit to arbitration, namely, independently." 514 U.S. at 943, 115 S. Ct. at 1924. The Court further explained that "[w]hen deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." 514 U.S. at 944, 115 S. Ct. at 1924. The Court then added a "qualification" to this general principle, emphasizing that "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." 514 U.S. at 944, 115 S. Ct. at 1924.
>
> Applying these principles to the case before it, the Court held that petitioner First Options had failed to show that the respondents, Manuel and Carol Kaplan, had "clearly agreed to have the arbitrators decide (*i.e.,* to arbitrate) the question of arbitrability." 514 U.S. at 946, 115 S. Ct. at 1925.

In so ruling, the Court found it insufficient that the Kaplans had filed a written memorandum with the arbitrators objecting to their jurisdiction, explaining that "merely arguing the arbitrability issue to an arbitrator does not indicate a clear willingness to arbitrate that issue, *i.e.,* a willingness to be effectively bound by the arbitrator's decision on that point." 514 U.S. at 946, 115 S. Ct. at 1925. Rather, in light of the Kaplans' "forceful[] object[ions] to the arbitrators deciding their dispute with First Options," the Court reasoned that it was far more plausible to conclude "that they did *not* want the arbitrators to have binding authority over them." 514 U.S. at 946, 115 S. Ct. at 1925. Accordingly, because the Kaplans "did not clearly agree to submit the question of arbitrability to arbitration," the Court held that the arbitrators' determination of this question "was subject to independent review by the courts." 514 U.S. at 947, 115 S. Ct. at 1925-26.

*Quixtar,* 2008 WL 5386774, at *10.

To resolve the "standard of review" question here, then, the Court must begin with the terms of the parties' agreement, inquiring whether the parties agreed to submit the issue of arbitrability to the arbitrator or instead intended to reserve this matter for the courts. Under the Rules of Conduct that governed the relationship between Petitioner and the Respondent IBOs, the parties were directed to use a set of "Dispute Resolution Procedures" to "address any issues that relate to" an IBO's business. (Petitioner's Motion, Ex. 2, Rules of Conduct ("ROC") Rule 11.)[3] As part of this dispute resolution process, if the parties were unable to resolve a dispute within 90 days or after the exhaustion of a "Conciliation Process," they were "required to submit any remaining claim(s) arising out of or relating to [an] IB, the IBO Plan, or the Rules of Conduct . . . to

---

[3]This Rule includes an exception for debt claims in amounts less than $10,000, whether asserted "by the IBO or the Corporation," which may be pursued "in any court of competent jurisdiction." (*Id.*) This exception plainly does not apply here. Apart from this exception, the parties agreed "[i]n all other cases" to "try to resolve the dispute as provided for under these Rules." (*Id.*)

binding arbitration in accordance with the Arbitration Rules" set forth in the Rules of Conduct. (ROC Rule 11.5.) Under Rule 11.5, the resulting arbitrator's award was deemed "final and binding" and enforceable "by any court of competent jurisdiction," with the "United States Arbitration Act" (presumably the FAA) "govern[ing] the interpretation [and] enforcement" of the parties' arbitration agreement. (*Id.*)

As noted, the Rules of Conduct incorporate a set of "Arbitration Rules" that govern arbitration proceedings conducted as part of the overall "Dispute Resolution Process." One of these "Arbitration Rules" specifically addresses the arbitrator's authority to decide questions of arbitrability:

### 11.5.4. Interpretation of Rules and Jurisdictional Challenges

Once appointed, the Arbitrator will resolve disputes about the interpretation and applicability of these Rules, including disputes relating to the duties of the Arbitrator and the conduct of the Arbitration Hearing. The resolution of the issue by the Arbitrator is final.

Jurisdictional and arbitrability disputes, including disputes over the existence, validity, interpretation, or scope of the agreement under which Arbitration is sought, may be submitted to and ruled on by the Arbitrator, unless the relevant law requires that a court make such determinations. The Arbitrator has the authority to determine jurisdiction and arbitrability prior to conducting a full hearing on the merits.

(ROC Rule 11.5.4.)

Under Rule 11.5.4, then, the arbitrator is expressly vested with the authority to decide "[j]urisdictional and arbitrability disputes, including disputes over the existence, validity, interpretation, or scope of the agreement under which Arbitration is sought." Each of the threshold challenges asserted in Respondents' motion in this case — namely,

that the agreement to arbitrate does not reach disputes between Petitioner and former IBOs, and that this agreement is unenforceable as illusory and unconscionable, (*see* Respondents' Motion, Br. in Support at 7-30) — plainly qualifies as a "jurisdictional" or "arbitrability" dispute within the meaning of Rule 11.5.4. Under comparable circumstances, where parties have included language in their arbitration agreement authorizing the arbitrator to decide issues of arbitrability, the courts have held that such a provision serves as the requisite "clear and unmistakable evidence" under *First Options* that the parties agreed to arbitrate arbitrability. *See, e.g., Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366, 1373 (Fed. Cir. 2006); *Terminix International Co. v. Palmer Ranch Limited Partnership,* 432 F.3d 1327, 1332 (11th Cir. 2005); *Contec Corp. v. Remote Solution Co.,* 398 F.3d 205, 208 (2d Cir. 2005); *FSC Securities Corp. v. Freel,* 14 F.3d 1310, 1312-13 (8th Cir. 1994); *Apollo Computer, Inc. v. Berg,* 886 F.2d 469, 473 (1st Cir. 1989); *Bishop v. Gosiger, Inc.,* 692 F. Supp.2d 762, 769 (E.D. Mich. 2010).

In an effort to avoid this result, Respondents point to the seemingly discretionary language of Rule 11.5.4, under which jurisdictional and arbitrability disputes "***may*** be submitted to and ruled on by the Arbitrator." In Respondents' view, the parties remain free under this Rule to elect ***not*** to submit a jurisdictional or arbitrability dispute to the arbitrator. Yet, this discretionary language does not necessarily distinguish the agreement here from the arbitration agreements in the above-cited cases. Rather, the rulings in these cases rested upon the fact that the parties had authorized the arbitrator to resolve disputes over arbitrability, and not just substantive matters. In *Contec,* 398 F.3d at 208, for

example, the Second Circuit explained that where "parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." Likewise, in this case, the parties surely empowered the arbitrator to hear and resolve "[j]urisdictional and arbitrability disputes," and this conclusion does not hinge upon the use of the word "may" or "must" — either word would equally confer the authority to decide such disputes.

In any event, if the language of Rule 11.5.4 alone does not supply a sufficiently clear statement of the parties' intent to authorize the arbitrator to decide questions of jurisdiction and arbitrability, Respondents have removed all doubt on this point by acting in accordance with this stated intent. In particular, Respondents filed a pair of motions in the arbitration proceedings in which they raised each of the jurisdictional and arbitrability challenges they seek to pursue before this Court. In the first of these motions, Respondents argued that the arbitration provisions in the Rules of Conduct were unenforceable for lack of mutuality of obligation and as procedurally and substantively unconscionable. (*See* Respondents' Motion, Ex. 36.) In their second motion, Respondents contended that Petitioner's claims in arbitration rested upon contractual provisions in the Rules of Conduct that were either unenforceable or did not give rise to legal obligations owed by Respondents. (*See* Case No. 08-14346, Dkt. No. 40, Ex. E.)[4]

_____

[4]Although it is difficult to say for certain, given the veritable avalanche of papers submitted by the parties, it does not appear that this latter motion has been filed as an exhibit in

As this Court observed in the earlier litigation between Petitioner and Respondents, these motions did not contest the arbitrator's authority to decide Respondents' threshold challenges to the arbitrator's jurisdiction and to arbitrability. *See Quixtar,* 2008 WL 5386774, at *11. To the contrary, and as this Court previously recognized, Respondents expressly cited Rule 11.5.4 as imposing upon the arbitrator the affirmative obligation to resolve these threshold matters. *See Quixtar,* 2008 WL 5386774, at *11 (citing Case No. 08-14346, Dkt. No. 40, Ex. E, Respondents' Br. in Support of Motion to Dismiss at 1). Indeed, a party seemingly cannot invite an arbitrator to dismiss an arbitration proceeding on jurisdictional or arbitrability grounds without acknowledging, at least implicitly, that the arbitrator has the authority to decide such questions. Here, this recognition was explicit in Respondents' motions, and confirmed what was clear from Rule 11.5.4 itself — namely, that the parties had empowered the arbitrator to rule upon "[j]urisdictional and arbitrability disputes."

Under this record, the Court does not view the "standard of review" question as turning upon considerations of waiver or abandonment. Nor does the Court find it necessary to decide whether Respondents exhausted (or were required to exhaust) all possible avenues of judicial recourse before they presented their jurisdictional and arbitrability disputes to the arbitrator. Rather, the Court instead views Respondents' actions during the arbitration — and, in particular, their submission of motions

---

this case. Nonetheless, it was filed with the Court in the prior suit brought by Petitioner, Case No. 08-14346, and thus is available on the docket in that case.

challenging the arbitrator's jurisdiction and the arbitrability of Petitioner's claims — as both an acknowledgment and an affirmative exercise of the parties' contractual right to present questions of jurisdiction and arbitrability for determination by the arbitrator. Having asserted this contractual right, and having secured the requested rulings (albeit not the desired outcome) on their challenges to jurisdiction and arbitrability, Respondents cannot now seek independent judicial review of these matters. *See PowerAgent Inc. v. Electronic Data Systems Corp.,* 358 F.3d 1187, 1192 (9th Cir. 2004) ("Having affirmatively urged the arbitrators to decide arbitrability and asserted their authority to do so, [a party to the arbitration] cannot await the outcome and, after an unfavorable decision, challenge the authority of the arbitrators to act on that very issue."); *Tristar Pictures, Inc. v. Director's Guild of America, Inc.,* 160 F.3d 537, 540 (9th Cir. 1998) (reasoning that by submitting an arbitrability challenge to the arbitrator, petitioner Tristar "by its conduct evinced clearly its intent to allow the arbitrator to decide not only the merits of the dispute but also the question of arbitrability" (internal quotation marks, alteration, and citations omitted)).

This conclusion is fully in accord with the Supreme Court's recognition in *First Options* that "arbitration is simply a matter of contract between the parties," with the parties free to choose which types of disputes (if any) they wish to resolve through this means. *First Options,* 514 U.S. at 943, 115 S. Ct. at 1924. In that case, two of the parties before the Court, Manuel and Carol Kaplan, "denied that their disagreement with [petitioner] First Options was arbitrable," on the ground that they "had not personally

signed" the "only . . . document . . . that contained an arbitration clause." 514 U.S. at 941, 115 S. Ct. at 1922. Although the Kaplans "fil[ed] with the arbitrators a written memorandum objecting to the arbitrators' jurisdiction," the Court found that this did not "indicate a clear willingness to arbitrate that issue, *i.e.,* a willingness to be effectively bound by the arbitrator's decision on that point." 514 U.S. at 946, 115 S. Ct. at 1925. Rather, the Court observed that "insofar as the Kaplans were forcefully objecting to the arbitrators deciding their dispute with First Options, one naturally would think that they did *not* want the arbitrators to have binding authority over them." 514 U.S. at 946, 115 S. Ct. at 1925.

*First Options* shows, then, that a party's mere submission of an arbitrability challenge to the arbitrator does not, by itself, demonstrate the requisite "clear and unmistakable" intent to be bound by the arbitrator's resolution of this challenge. Here, however, Respondents' election to submit issues of jurisdiction and arbitrability to the arbitrator does not stand alone, but is instead accompanied by contractual language that both (i) permits the parties to submit these issues to the arbitrator, and (ii) empowers the arbitrator to decide these issues. There was no such contractual language in *First Options* that a court could look to as evidence of the parties' intent; to the contrary, the Kaplans, as individuals, were not even parties to any contract containing an arbitration clause. In light of this crucial distinction, the Court finds ample basis for a different result here.

Finally, the Supreme Court's recent decision in *Rent-a-Center, West, Inc. v. Jackson,* 130 S. Ct. 2772 (2010), lends further support to the conclusion that the

arbitrator's decisions on jurisdiction and arbitrability should be reviewed under a deferential standard.  In that case, the parties' arbitration agreement included provisions that broadly called for arbitration of "all past, present or future disputes arising out of [respondent] Jackson's employment with [petitioner] Rent-a-Center," and that conferred upon the arbitrator the "exclusive authority to resolve any dispute relating to the enforceability of" the arbitration agreement.  *Rent-a-Center,* 130 S. Ct. at 2777 (internal quotation marks, alterations, and citations omitted).  The Court referred to the latter of these two provisions as the "delegation provision," and observed that, under its precedents, "parties can agree to arbitrate gateway questions of arbitrability, such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy."  130 S. Ct. at 2777 (citations omitted).  Such "[a]n agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other."  130 S. Ct. at 2777-78.

The Court then discussed the different types of challenges that a party might bring under § 2 of the FAA, 9 U.S.C. § 2, in order to contest the validity or enforceability of an agreement to arbitrate:

> There are two types of validity challenges under § 2:  One type challenges specifically the validity of the agreement to arbitrate, and the other challenges the contract as a whole, either on a ground that directly affects the entire agreement (*e.g.,* the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid.  In a line of cases neither party has asked us to overrule, we held that only the first type of challenge is relevant to a

court's determination whether the arbitration agreement at issue is enforceable. That is because § 2 states that a "written provision" "to settle by arbitration a controversy" is "valid, irrevocable, and enforceable" *without mention* of the validity of the contract in which it is contained. Thus, a party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate. As a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract.

But that agreements to arbitrate are severable does not mean that they are unassailable. If a party challenges the validity under § 2 of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that agreement under § 4 . . . . In some cases the claimed basis of invalidity for the contract as a whole will be much easier to establish than the same basis as applied only to the severable agreement to arbitrate. Thus, in an employment contract many elements of alleged unconscionability applicable to the entire contract (outrageously low wages, for example) would not affect the agreement to arbitrate alone. But even where that is not the case . . . we nonetheless require the basis of challenge to be directed specifically to the agreement to arbitrate before the court will intervene.

130 S. Ct. at 2778 (internal quotation marks and citations omitted).

Applying these principles to the case before it, the Court observed that respondent Jackson had "challenged only the validity of the contract as a whole" — that is, the entirety of the parties' arbitration agreement — and had not mounted a separate and distinct challenge to the "delegation provision." 130 S. Ct. at 2779. In particular, Jackson contended that the entire arbitration agreement, including its delegation provision, was both procedurally and substantively unconscionable, but he did not separately contest petitioner Rent-a-Center's argument that, under the agreement's delegation provision, the arbitrator was to decide Jackson's threshold challenges to the enforceability of the agreement. 130 S. Ct. at 2779-80. Because Jackson had not

"challenged the delegation provision specifically," and because it was this provision that Rent-a-Center was seeking to enforce, the Court held that "we must treat it as valid under § 2, and must enforce it under §§ 3 and 4, leaving any challenge to the validity of the [arbitration agreement] as a whole for the arbitrator." 130 S. Ct. at 2779.

The ruling in *Rent-a-Center* provides further confirmation that the arbitrator's decisions in this case on matters of jurisdiction and arbitrability must be reviewed under a deferential standard. As discussed in this Court's opinion in the earlier suit brought by Petitioner, and as reiterated above, "Respondents submitted the issue of arbitrability to the arbitrator for her consideration, without separately arguing that the arbitrator had no authority to decide the issue of arbitrability." *Quixtar,* 2008 WL 5386774, at *11 (internal quotation marks, alteration, and citation omitted). Similarly, in their pending motion to vacate in the present suit, Respondents have advanced various challenges to the enforceability of the parties' arbitration agreement as a whole, as well as the Rules of Conduct within which this agreement is contained, but they do not separately contest the enforceability of the specific provision within the Rules of Conduct, Rule 11.5.4, that empowers the arbitrator to decide jurisdictional and arbitrability disputes. Under *Rent-a-Center,* then, this "delegation provision" in Rule 11.5.4 is entitled to enforcement under the FAA, and Respondents' challenges to the validity of the parties' arbitration agreement as a whole were properly left for the arbitrator to decide. This, in turn, triggers deferential review of the arbitrator's determinations on those matters that Rule 11.5.4 gave her the power to decide.

**2. The Arbitrator's Rulings on Arbitrability Readily Survive Scrutiny Under the Deferential Standard of Review That Applies to These Rulings.**

Having resolved the threshold issue of the standard of review under which to review the arbitrator's decisions on matters of jurisdiction and arbitrability, the Court turns to the (far easier) question whether the arbitrator's determinations pass muster under this standard. An arbitrator's decision on a matter that the parties have elected to submit for her determination may be set aside only on the limited grounds set forth in § 10 of the FAA, 9 U.S.C. § 10. *See Hall Street Associates, L.L.C. v. Mattel, Inc.,* 552 U.S. 576, 590, 128 S. Ct. 1396, 1406 (2008); *Grain v. Trinity Health, Mercy Health Services Inc.,* 551 F.3d 374, 378 (6th Cir. 2008). Section 10, in turn, provides that an arbitrator's decision may be vacated only under the following circumstances:

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).[5]  As the Supreme Court has recognized, only in "very unusual circumstances" will an arbitrator's decision fail to survive scrutiny under this deferential standard.  *First Options,* 514 U.S. at 942, 115 S. Ct. at 1923.

In this case, as Petitioner points out, Respondents have utterly failed to "argue or explain how the Court could vacate the Arbitrator's ruling on arbitrability" under the deferential standard that governs the Court's review of this ruling.  (Petitioner's 12/31/2009 Reply Br. at 12.)  Rather, Respondents' argument on this point is relegated to a footnote, in which they summarily assert that "the Arbitrator's rulings on the arbitrability issues were flatly contrary to clearly established law and to the undisputed facts," and "[t]herefore . . . would have to be vacated even under a deferential standard of review."  (Respondents' Motion, 12/4/2009 Br. in Support at 7 n.7.)[6]  "It is well-

---

[5]Apart from these criteria set forth in § 10, some case law holds that an arbitrator's decision may be set aside if the arbitrator "act[s] with manifest disregard for the law."  *See, e.g., Nationwide Mutual Insurance Co. v. Home Insurance Co.,* 429 F.3d 640, 643 (6th Cir. 2005) (internal quotation marks and citations omitted).  Yet, the Supreme Court has held that §§ 10 and 11 "provide [the] exclusive regime[]" for judicial consideration whether to vacate or modify an arbitrator's award.  *Hall Street,* 552 U.S. at 590, 128 S. Ct. at 1406.  This has led the Sixth Circuit to recently observe that *Hall Street* "casts some doubt on the continuing vitality" of the "manifest disregard" standard.  *Grain,* 551 F.3d at 380.  In another (albeit unpublished) decision, however, a Sixth Circuit panel elected to "follow . . . well-established precedent . . . and continue to employ the 'manifest disregard' standard."  *Coffee Beanery, Ltd. v. WW, L.L.C.,* No. 07-1830, 300 F. App'x 415, 419 (6th Cir. Nov. 14, 2008).  For present purposes, this Court deems it unnecessary to decide whether *Hall Street* has supplanted this ground for vacating an arbitrator's decision, but instead assumes that this standard remains available for application here.

[6]Even in the 145-page brief that Respondents initially sought to file in support of their motion to vacate, this argument still was deemed worthy of only a footnote, with Respondents stating in a wholly conclusory fashion that "the arbitrator's ruling on the arbitrability issues was flatly contrary to established law."  (Docket #39, Respondents' 11/6/2009 Br. in Support at 52 n.51.)

established that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argument, are deemed waived." *Dillery v. City of Sandusky,* 398 F.3d 562, 569 (6th Cir. 2005) (internal quotation marks and citations omitted); *see also Bishop, supra,* 692 F. Supp.2d at 774 ("It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to put flesh on its bones." (internal quotation marks and citations omitted)).  This rule is particularly applicable here, where Respondents are represented by able counsel who have proven quite capable of advancing a number of arguments backed by a thorough discussion of the case law and citation to the pertinent record, and where Respondents have been given ample opportunity to present and develop any desired arguments over the course of a 50-page brief.

Even if this challenge had not been waived, the Court would readily conclude that the arbitrator's decisions on questions of arbitrability were not "flatly contrary to clearly established law" as Respondents contend.  Assuming that Respondents mean by this contention to appeal to the "manifest disregard" standard of review, and assuming that this standard remains viable in the wake of the *Hall Street* decision, the Sixth Circuit has recognized that "manifest disregard of the law is a very narrow standard of review," and that "[a] mere error in interpretation or application of the law is insufficient" to disturb an arbitrator's ruling. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros,* 70 F.3d 418, 421 (6th Cir. 1995).  "Rather, the decision must fly in the face of clearly established legal precedent," and an arbitrator will not be deemed to have acted in manifest disregard of the law "unless (1) the applicable legal principle is clearly defined and not subject to

reasonable debate; and (2) the arbitrators refused to heed that legal principle." *Merrill Lynch,* 70 F.3d at 421.

Respondents have identified three aspects of the arbitrator's rulings which, in their view, were flatly contrary to clearly established law. First, they contend that the parties' arbitration agreement requires only current IBOs, and not former IBOs, to participate in arbitration. As support for this proposition, they rely principally upon a district court ruling that construed the Amway Rules of Conduct as binding only current IBOs to arbitrate their disputes with Petitioner, and as reaching only those disputes that arise prior to the termination of an IBO's relationship with Petitioner. *See MonaVie, LLC v. Quixtar Inc.,* 2009 WL 3584331, at *5-*6, *8 (D. Utah Oct. 26, 2009). As Petitioner points out, however, this ruling is in tension with (and does not address) the presumption that a party's obligation to arbitrate generally survives the termination of the underlying contract containing the arbitration provision, at least as to disputes arising out of the contractual relationship. *See Litton Financial Printing Division v. NLRB,* 501 U.S. 190, 208, 111 S. Ct. 2215, 2226 (1991) ("We presume as a matter of contract interpretation that the parties did not intend a pivotal dispute resolution provision to terminate for all purposes upon the expiration of the agreement."); *Zucker v. After Six, Inc.,* No. 05-3347, 174 F. App'x 944, 947-48 (6th Cir. Apr. 7, 2006); *Bishop, supra,* 692 F. Supp.2d at 775; *Lyman v. Greater Boston Radio, Inc.,* No. 09-14502, 2010 WL 2557831, at *6 (E.D. Mich. June 21, 2010) (collecting cases). Moreover, the dispute here arguably arose out of the contractual relationship, as it rests upon allegations that Respondents breached

obligations owed under the Rules of Conduct not to solicit IBOs to a competitor for a limited time and not to use Petitioner's trade secrets. Under these circumstances, the arbitrator's decision cannot be said to be flatly contrary to clearly established law.

Next, Respondents contend that the arbitrator erred by failing to follow, or give preclusive effect to, the Fifth Circuit's ruling in *Morrison v. Amway Corp.,* 517 F.3d 248, 254-57 (5th Cir. 2008), that the arbitration agreement between Petitioner and the plaintiff distributors in that case was illusory and unenforceable. Yet, as to Respondents' claim of issue preclusion, this Court expressed doubt in the prior suit brought by Petitioner that the ruling in *Morrison,* decided under Texas law, would be binding on Petitioner under the standards of Michigan law that govern here. *See Quixtar,* 2008 WL 5386774, at *5.[7] Moreover, it is clear that *Morrison* would be entitled to issue-preclusive effect only if that case and this one involve the same or materially indistinguishable facts. *See Cincinnati*

---

[7]The Court acknowledges that on appeal from this ruling, the Sixth Circuit suggested in a footnote that this Court had "erred in stating that merely because the court in *Morrison* . . . applied a different jurisdiction's substantive law (that of Texas instead of Michigan), it necessarily did not decide the precise issue presented in the instant litigation." *Quixtar,* 328 F. App'x at 323 n.4. Interestingly, however, in a more recent published decision, the Sixth Circuit quoted with approval from this Court's ruling in *Quixtar* (and did not mention its own unpublished decision on appeal from this Court's ruling), holding that issue preclusion did not bar the relitigation of a question of insurance coverage decided by a South Carolina state court under South Carolina law because, while the same insurance policy language was at issue, the question in the case before the court was "whether such damage is covered under *Indiana* insurance law." *Cincinnati Insurance Co. v. Beazer Homes Investments, LLC,* 594 F.3d 441, 444-47 (6th Cir. 2010). This published Sixth Circuit decision, then, appears to have adopted the very same view of the "same issue" prong of the test for issue preclusion as this Court applied in *Quixtar.* At a minimum, the arbitrator would not have acted contrary to "clearly established law" by applying the same issue preclusion analysis employed by this Court in *Quixtar* and evidently adopted by the Sixth Circuit in *Cincinnati Insurance.*

*Insurance,* 594 F.3d at 445.  As Petitioner points out, Michigan Circuit Judge (and now

federal District Judge) Mark A. Goldsmith held that there were "critical distinctions"

between the facts in *Morrison* and the facts of the case before him, *Freeze v. Quixtar,*

*Inc.,* No. 07-085295, slip op. at 5 (Mich. Cir. Ct. July 28, 2008) (attached as Exhibit 10 to

Petitioner's Response to Respondents' Motion), and these same factual distinctions are

present here — most notably, that in *Morrison,* 517 F.3d at 256, Petitioner sought "to

enforce an arbitration agreement *with respect to* a dispute which arose, and concern[ing]

matters which occurred, *before*" Petitioner introduced an arbitration provision into its

IBO agreements, while the disputes here (and in *Freeze*) post-date the parties' entry into

an agreement to arbitrate their disputes.  Accordingly, Judge Goldsmith held that the

ruling in *Morrison* was "neither controlling nor persuasive," *Freeze,* slip op. at 6, and the

arbitrator would not have acted in disregard of clearly established law by reaching the

same conclusion in this case.

      Finally, Respondents suggest that the arbitrator ruled contrary to clearly

established law by failing to hold that the parties' arbitration agreement is procedurally

and substantively unconscionable.  As Respondents recognize, Michigan law requires that

both forms of unconscionability must be shown in order to declare an arbitration

provision unconscionable.  *See Lozada v. Dale Baker Oldsmobile, Inc.,* 91 F. Supp.2d

1087, 1100 (W.D. Mich. 2000).  Again, however, Petitioner points to decisions in which

courts have found that its arbitration agreement with its IBOs is not procedurally

unconscionable.  *See, e.g., McCrone v. Quixtar, Inc.,* No. 07-2737, slip op. at 9-12 (N.D.

Ohio Feb. 21, 2008) (attached as Exhibit 12 to Petitioner's Response to Respondents'

Motion); *U-Can-II v. Setzer,* No. 02-2535-CA, slip op. at 15-16 (Fla. Cir. Ct. Apr. 23,

2003) (attached as Exhibit 13 to Petitioner's Response to Respondents' Motion). Thus, it

cannot be said that the arbitrator disregarded a clearly established and unified body of law

in rejecting Respondents' unconscionability challenge to their arbitration agreement with

Petitioner.

**B.     The Arbitrator's Rulings on the Merits of Petitioner's Claims Against Respondents Survive Scrutiny Under the Applicable, Deferential Standard of Review.**

    **1.     The Standards Governing This Court's Review of the Arbitrator's Rulings.**

Respondents acknowledge that this Court's review of the arbitrator's decisions on

the merits of Petitioner's claims against Respondent is governed by a deferential standard.

In particular, and as stated earlier, the arbitrator's award may be vacated only on the four

grounds set forth in § 10 of the FAA, 9 U.S.C. § 10, which are listed above and need not

be repeated here. Alternatively, the arbitrator's award may be modified or corrected on

the following grounds:

    (a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award[;]

    (b) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted[; or]

    (c) Where the award is imperfect in matter of form not affecting the merits of the controversy.

9 U.S.C. § 11.

As the Sixth Circuit has observed, the FAA "expresses a presumption that arbitration awards will be confirmed," and judicial review of an arbitrator's decision "is very narrow; one of the narrowest standards of judicial review in all of American jurisprudence." *Nationwide Mutual Insurance,* 429 F.3d at 643. Nonetheless, an arbitrator's award must be set aside where the arbitrator exceeds her power by "act[ing] beyond the material terms of the contract from which [she] draw[s] [her] authority, or in contravention of controlling principles of law." *Electronic Data Systems Corp. v. Donelson,* 473 F.3d 684, 688 (6th Cir. 2007) (internal quotation marks and citations omitted). Similarly, an award must be vacated "if, from an analysis of the transcript of the arbitration proceeding and the evidence provided to the [arbitrator], absolutely no rational means c[an] be determined by which the [arbitrator] may have come to [her] decision." *Fitzgerald v. H & R Block Financial Advisors, Inc.,* No. 08-10784, 2008 WL 2397636, at *5 (E.D. Mich. June 11, 2008).

In this case, the arbitrator did not give reasons for her award in favor of Petitioner and against Respondents, explaining that under Rule 11.5.47 of the Rules of Conduct, the arbitrator may provide a summary of reasons for an award only upon the unanimous written request of all parties, and that only Petitioner, and not Respondents, gave the requisite consent. (*See* Petitioner's Motion, Ex. 1, Final Award at 2.) "Arbitrators are not required to explain their decisions," and "[i]f they choose not to do so, it is all but impossible to determine whether they acted with manifest disregard for the law."

27

*Dawahare v. Spencer,* 210 F.3d 666, 669 (6th Cir. 2000); *see* also Merrill *Lynch,* 70 F.3d

at 421 ("Where, as here, the arbitrators decline to explain their resolution of certain

questions of law, a party seeking to have the award set aside faces a tremendous

obstacle."); *Fitzgerald,* 2008 WL 2397636, at *4-*5.  Under these circumstances, "[i]f a

court can find any line of argument that is legally plausible and supports the award then it

must be confirmed," and "[o]nly where no judge or group of judges could conceivably

come to the same determination as the arbitrators must the award be set aside."  *Merrill*

*Lynch,* 70 F.3d at 421.[8]

> **2.      Respondents' Various Challenges to the Arbitrator's**
> **Determinations on Liability and Damages Do Not Provide a**
> **Basis for Vacating the Arbitrator's Award.**

Broadly speaking, Respondents have mounted three challenges to the arbitrator's

award.  First, they contend that the arbitrator's award of over $25.8 million was based on

theories of liability and damages that are contrary to clearly established law and

unsupported by the evidentiary record presented to the arbitrator.  Next, they argue that

the arbitrator's imposition of liability upon the Respondent wives — Laurie Woodward,

Terri Brady, and Amy Marks — was the product of a manifest disregard for the law.

Finally, Respondents assert that Petitioner procured an award in its favor by undue

means, where it purportedly withheld pertinent information that would have enabled

---

[8]As Respondents point out, although the arbitrator here gave no statement of reasons for
her award, it nonetheless is possible to infer at least a portion of the rationale behind the award
from statements in the award itself, and from the arbitrator's resolution of the parties' earlier
round of motions for summary disposition.  Where this is possible, the Court's review will be
based on the actual grounds relied upon by the arbitrator in making the challenged award.

Respondents to impeach the testimony of Petitioner's damage expert. The Court addresses each of these challenges in turn.

### (a) Petitioner's Theories of Liability and Damages

As noted earlier, and as summarized in the arbitrator's award, Petitioner's claims against Respondents rested upon theories of breach of contract, tortious interference, and misappropriation of trade secrets. In light of the arbitrator's statements in her award regarding (i) her rulings on the parties' motions for summary disposition and (ii) the conduct giving rise to Respondents' liability, (*see* Final Award at 4, 6), it seems fair to say that the award was based upon the first of these theories — namely, that Respondents breached the Rules of Conduct by soliciting other IBOs to compete with Petitioner's business. More specifically, Respondents evidently were held liable for violating Rule of Conduct 6.5.5, which prohibits IBOs from "encourag[ing], solicit[ing], or otherwise attempt[ing] to recruit or persuade any other IBO to Compete with the business of the Corporation." (Petitioner's Response to Respondents' Motion, Ex. 5, ROC Rule 6.5.5.)[9] In challenging the arbitrator's award, Respondents argue that there was no evidentiary or legal basis upon which the arbitrator could have found that they breached Rule of Conduct 6.5.5, and that the arbitrator's award of damages for any such breach likewise lacked support in the record or the law.

---

[9]As Respondents point out, the relevant definition of "Compete" as set forth in the Rules of Conduct is "to own, manage, operate, consult for, be employed by, or participate as an independent distributor in . . . (b) any other enterprise that markets, through independent distributors, products or services functionally interchangeable with those offered or marketed by the Corporation." (ROC Rule 6.5.1.)

Turning first to Respondents' challenge to the arbitrator's finding of breach-of-contract liability, Respondents do not contest that Petitioner introduced evidence in the course of the arbitration proceeding of a three-stage strategy employed by Respondents under which (i) IBOs terminated their relationship with Petitioner, (ii) these former IBOs remained affiliated among themselves and with Respondents by means of the "TEAM" organization co-founded by Respondents Orrin Woodward and Chris Brady, and (iii) Respondents then issued coordinated statements in which they announced that they were joining Petitioner's competitor, MonaVie, and listed their reasons for doing so. This record includes evidence that would readily be characterized as solicitations; most notably, in a blog entry in which Orrin Woodward announced his decision to join MonaVie and gave his reasons for doing so, he stated, "If you knew what I knew, you would do what I do." (Petitioner's Response to Respondents' Motion, Ex. 82.) More generally, this record is summarized in Petitioner's brief in response to Respondents' motion to vacate the arbitrator's award, (*see* Petitioner's Response, Br. at 35-39), and this summary need not be repeated here, as Respondents do not challenge the general thrust of this evidence.

Rather, Respondents contend that this record fails in two respects to establish any actionable solicitation in violation of Rule of Conduct 6.5.5. First, they assert that to the extent Petitioner relies upon blogs and website postings to establish violations of the non-solicitation provision in the Rules of Conduct, such passive, untargeted communications fail as a matter of law to qualify as actionable solicitations. Yet, common sense dictates

that it is the **substance** of the message conveyed, and not the medium through which it is transmitted, that determines whether a communication qualifies as a solicitation. The above-quoted statement from Respondent Woodward's website, for example, is readily characterized as an invitation for the reader to follow his lead and join Petitioner's competitor MonaVie, and this is true despite the diffuse and uncertain readership of the site.

The courts have confirmed that communications qualifying as solicitations do not lose this character simply by virtue of being posted on the Internet. *See, e.g., Domino's Pizza PMC v. Caribbean Rhino, Inc.,* 453 F. Supp.2d 998, 1000 (E.D. Mich. 2006) (describing the defendant's efforts to "solicit[] pizza franchises by telephone and internet websites to participate in his pizza card program"); *United States v. Zein,* No. 09-20237, 2009 WL 4884973, at *2 (E.D. Mich. Dec. 11, 2009) (determining, for purposes of calculating a defendant's sentencing range under the U.S. Sentencing Guidelines, that the placement of an advertisement on the Craigslist website "certainly qualifies as a plan to solicit by the internet"). More to the point, in *United States v. Pirello,* 255 F.3d 728, 732 (9th Cir. 2001), the Ninth Circuit rejected a defendant's contention that he had not engaged in "mass marketing" by posting classified ads on the Internet because "only three people responded to his advertisement." In holding that the defendant was properly subject to a "mass marketing" sentencing enhancement, the court reasoned that his ad "invited *any* and *all* persons to send money for computers that [he] had no intention of providing," and that "[t]he relatively low number of individuals actually victimized by

[the defendant] before the FBI ended his scheme was the product of chance, and is in no way indicative of the breadth of [his] solicitation." *Pirello,* 255 F.3d at 732. Notably, the dissent in that case, like Respondents here, argued that the "passive placement" of an advertisement on an Internet website devoted to that purpose should not qualify as solicitation because it did not entail "one-on-one importuning" and was not "directed at specific individuals," *Pirello,* 255 F.3d at 733 (Berzon, J, dissenting), but this contention failed to carry the day. While these cases, of course, arise in different contexts and under different bodies of law, they nonetheless demonstrate that the arbitrator did not act with manifest disregard for the law by viewing Respondents' Internet-based communications as evidence of actionable solicitation.

On a related note, Petitioner points to the decision in *Neways Inc. v. Mower,* 543 F. Supp.2d 1277 (D. Utah 2008), as indicating that solicitation encompasses more than simply explicit, one-to-one exhortations. In that case, the court found that the defendant distributors violated a contractual non-solicitation clause through such activities as (i) providing information to other distributors about the plaintiff's competitor, (ii) holding a series of meetings at the home of one of the defendant distributors at which the competitor's products and compensation plan were discussed, (iii) sponsoring former distributors of the plaintiff's products into the competitor's network of distributors, and (iv) giving speeches about the competitor's mission and products at seminars likely to be attended by plaintiff's distributors. *Neways,* 543 F. Supp.2d at 1286-87. Likewise, in this case, even assuming the record lacked any overt appeals to enlist with MonaVie, it

certainly discloses examples of Respondents providing information to other current and recently-departed members of Petitioner's IBO network about the drawbacks of remaining as Petitioner's IBOs and the advantages of joining the MonaVie network. To the extent that Respondents conveyed this information over the Internet, Petitioner points to evidence that Respondents viewed this as a more efficient and effective means of communication than, say, telephone calls, (*see, e.g.,* Arb. Hearing Tr. at 1302-03, 3905-06), as well as evidence of Respondents' awareness of the sizable audience they could reach through this means, (*see, e.g.,* Petitioner's Response to Respondents' Motion, Ex. 83 (Respondent Woodward's statement on his blog that there were nearly 100,000 viewings of his announcement that he was joining MonaVie)). Under this record, the arbitrator permissibly could have found that Respondents engaged in solicitation in violation of Rule of Conduct 6.5.5.

Next, Respondents seize upon Petitioner's failure to produce evidence that any particular IBO received the communications characterized by Petitioner as solicitations, much less that any specific IBO actually acted and relied upon these communications as grounds for leaving Petitioner's distributor network and joining MonaVie. Indeed, as a matter of brute fact, Respondents note that a large number of TEAM-affiliated IBOs had already terminated their relationships with Petitioner before Respondents began any of the activities that Petitioner has identified as impermissible solicitations — namely, Respondents' communications informing others about MonaVie and urging them to follow Respondents to this competitor. It follows, in Respondents' view, that Petitioner

cannot establish a breach of the non-solicitation provision in the Rules of Conduct.

There are two problems with this argument. First, and as Respondents themselves expressly acknowledge, nothing in the pertinent Rule of Conduct, Rule 6.5.5, "prohibit[s] soliciting an IBO to leave Amway." (Respondents' Motion, Br. in Support at 33.) Consequently, it is immaterial to Respondents' breach-of-contract liability whether their communications led any IBO to leave Petitioner's network of distributors, and it follows that they cannot be ***absolved*** of liability by showing that any such departing IBO did so before they commenced their solicitations to join MonaVie.[10] Next, and more importantly, the prohibition in Rule of Conduct 6.5.5 is against "encourag[ing], solicit[ing], or otherwise attempt[ing] to recruit or persuade any other IBO to Compete with" Petitioner's business, (ROC Rule 6.5.5), and a violation of this rule plainly does not turn upon the ***success*** of an IBO in persuading a fellow IBO to join a competitor such as MonaVie — it is enough that an IBO engaged in the act of soliciting the fellow IBO to do so, even if unsuccessfully. Any question as to the success of Respondents' solicitation efforts goes to the issue of damages.

Accordingly, the Court turns to Respondents' challenges to the arbitrator's

---

[10]Petitioner also points to the evidence which, in its view, establishes a multi-phase strategy to induce IBOs to leave Petitioner's network of distributors and join MonaVie. If the arbitrator viewed the record in this way, Respondents' impermissible solicitation efforts would not necessarily be confined to the final phase of this strategy, where they explicitly urged others to enlist with MonaVie, but also would encompass the earlier stages in which IBOs were exhorted to leave Petitioner's network in preparation for joining MonaVie. Under this broader view of Respondents' solicitation activities, it would not necessarily be true that many or most IBOs had already terminated their relationships with Petitioner before Respondents began the earlier stages of their overall "solicitation" efforts.

determination of the amount of a damage award. As Respondents point out, the arbitrator awarded the entirety of the damages computed by Petitioner's expert. Respondents summarize this damage calculation as follows (and Petitioner does not dispute the accuracy of this summary):

> Damages for Amway's solicitation claim were based upon the testimony of its two damage experts, Vincent Thomas, CPA, and Kenneth Wise, Ph.D. Thomas' expert opinions were limited solely to matching processes in which he determined that of the 110,000 distributors in Respondents' MonaVie downlines, 26,004 were former Amway IBOs. Wise used Thomas' match of 26,004 as a starting point to calculate the profits Amway "lost" due to solicitation, subtracting the IBOs who left Amway prior to August 9, 2007[11] and those who remained in Amway while joining MonaVie.

> The result was 22,778 former Amway IBOs in Respondents' MonaVie downlines, each of whom was a former Amway IBO who left Amway after August 9, 2007 and joined MonaVie before December 31, 2008. Wise then ran a query on this group of IBOs to determine the number of such former Amway IBOs in each of Respondents' individual MonaVie downlines. For Woodward, Wise calculated 4,602; for Brady, 3,499; for Marks, 1,279, for a total of 9,380. Wise's query did not include any names or other identifiers of those IBOs.

> To reach a lost profits amount, Wise then separately calculated an annual profit figure for Amway IBOs based on "seniority;" multiplied that figure by the number of IBOs in each of the Respondents' MonaVie downlines; carried out the calculation 20 years into Amway's future; then reduced the total to a net present value. The resulting "lost profits" were: **Woodward: $12,736,659; Brady: $9,578,756; and Marks: $3,533,230.** These are the exact amounts awarded by the Arbitrator. Neither Thomas nor wise had any opinions as to *why* any of the 9,380 left Amway or joined MonaVie. Thus, at best, all the experts did was calculate a purported lost profit number based on the departure of 9,380 former Amway IBOs.

---

[11]This is the date that the relationships between Petitioner and the Respondent IBOs were terminated.

(Respondents' Motion, Br. in Support at 32-33 (footnote and citations to record omitted).

In challenging the arbitrator's decision to award damages in the full amount identified by Petitioner's expert, Respondents point to various purported deficiencies in Petitioner's effort to prove that these damages were properly attributable to Respondents' breach of the non-solicitation provision at Rule of Conduct 6.5.5. First, and as noted earlier, Respondents point to the absence of evidence that they actually solicited the above-cited 9,380 former IBOs to leave Petitioner's network of distributors and join MonaVie, much less that any such solicitation efforts were the cause of these former IBOs' decisions to join Petitioner's competitor. Indeed, Petitioner made no effort to identify anyone in this class of 9,380 former IBOs, making it impossible, in Respondents' view, for Petitioner to meet its burden of linking Respondents' purported breach of Rule of Conduct 6.5.5 to any losses arising from this breach. Respondents further submit that Petitioner and its experts impermissibly failed to address or negate the many other reasons why, in their view, IBOs might have elected to leave Petitioner and join MonaVie.

As the parties agree, the Michigan courts follow the venerable rule of *Hadley v. Baxendale,* 9 Exch. 341 (1954), in determining the damages recoverable for a breach of contract. As stated by the Michigan Supreme Court, a party may recover "those [damages] that arise naturally from the breach or those that were in the contemplation of the parties at the time the contract was made." *Kewin v. Massachusetts Mutual Life*

*Insurance Co.,* 409 Mich. 401, 295 N.W.2d 50, 52-53 (1980).[12]  Respondents do not

contest the foreseeability that soliciting activities in violation of Rule of Conduct 6.5.5, if

found to have occurred, could be expected to cause IBOs to leave Petitioner and join a

competitor such as MonaVie.  More generally, Respondents do not dispute, at least before

this Court, that Petitioner introduced evidence that Respondents employed means of

communication (*e.g.,* mass e-mails, websites, and speeches at meetings and seminars) that

were designed to reach current and former IBOs, and that they had reason to believe they

were, in fact, successfully communicating to this audience.  Rather, Respondents'

challenge to the arbitrator's determination of damages is focused upon the lack of

evidence that any specific IBO, out of the 9,380 IBOs cited by Petitioner and its damage

expert, actually acted on these solicitations by leaving Petitioner for MonaVie.

    The Court finds nothing in the law that demands the form of proof Respondents

would require.  Presumably, Respondents would agree that Petitioner need not have

introduced direct evidence that each of the 9,380 IBOs relied upon in computing damages

received a soliciting communication from Respondents and acted upon it.  Yet, with

anything short of this comprehensive evidentiary showing as to why each of these 9,380

IBOs acted as they did, a trier of fact necessarily would have to extrapolate from a more

limited set of data in order to conclude that Petitioner was entitled to damages based upon

this entire universe of 9,380 departed IBOs who had joined MonaVie.  Plainly, then,

---

[12]The parties agree that Petitioner's claims in the arbitration proceeding were governed
by Michigan law.

Petitioner was entitled to rely, at least to some extent, upon inferential and statistical proofs in establishing how many IBOs defected to a competitor as a result of Respondents' solicitation efforts. Viewed in this light, it is not clear how the quality of the proofs would be substantially improved by insisting that Petitioner identify, say, one, ten, or perhaps one hundred specific IBOs who received Respondents' communications and were led through these solicitations to leave Petitioner and join MonaVie.

More generally, the case law confirms that breach-of-contract damages — including the lost profit damages sought by Petitioner and awarded by the arbitrator — may be established through methods of proof like the one employed by Petitioner here. Under Michigan law, "[i]t is clear that loss of future profits is permitted as an element of damages in breach of contract actions when they can be established with reasonable certainty." *American Anodco, Inc. v. Reynolds Metals Co.,* 743 F.2d 417, 423 (6th Cir. 1984) (citing *Fera v. Village Plaza, Inc.,* 396 Mich. 639, 242 N.W.2d 372 (1976)). In mandating such a showing, "[t]he law does not require impossibilities; and cannot therefore require a higher degree of certainty than the nature of the case admits." *American Anodco,* 743 F.2d at 423-24 (internal quotation marks and citations omitted). Moreover, lost profits need not be "determined to a mathematical certainty," and even when they are "difficult to calculate, and are speculative to some degree, they are still allowed as a loss item." *Lorenz Supply Co. v. American Standard, Inc.,* 100 Mich. App. 600, 300 N.W.2d 335, 340 (1980). The requisite proof may be supplied in the form of reasonable projections or statistical analyses. *See, e.g., Conwood Co. v. United States*

*Tobacco Co.,* 290 F.3d 768, 793-95 (6th Cir. 2002); *Multimatic, Inc. v. Faurecia Interior Systems USA, Inc.,* 542 F. Supp.2d 677, 681-82 (E.D. Mich. 2008); *Bero Motors, Inc. v. General Motors Corp.,* No. 257675, 2006 WL 2312182, at *7-*8 (Mich. Ct. App. Aug. 10, 2006).

Upon reviewing the record submitted for the arbitrator's consideration, the Court finds that it provides a sufficient basis for the arbitrator to accept the estimate of damages proffered by Petitioner's experts. First, Petitioner did, in fact, produce evidence of specific former IBOs who joined MonaVie as a result of Respondents' solicitation efforts. (*See, e.g.,* Arb. Hearing Tr. at 1170-76; Petitioner's Response to Respondents' Motion, Ex. 90.) Next, Petitioner introduced expert testimony that the manner and rate of departures of IBOs downline of Respondents could not have happened randomly or independently, and that such widespread departures had not occurred elsewhere in Petitioner's distribution network during the relevant time frame.[13] Finally, the former IBOs that formed the basis for Petitioner's damage calculation had ended up downline to Respondents in MonaVie's distribution network, rather than elsewhere in this network,

---

[13]Respondents make much of the fact that Petitioner's expert, Dr. Wise, relied exclusively on these sorts of statistical grounds in determining the appropriate base of former IBOs upon which to calculate damages, and they point to his concession that he "assum[ed] causation" in arriving at his damage estimates. (Arb. Hearing Tr. at 2593-94, 4527-28.) Yet, it is clear from the totality of Dr. Wise's testimony that he assumed *liability* — *i.e.,* that Respondents had engaged in conduct that violated Rule of Conduct 6.5.5 — and that, rather than focusing on the impact of Respondents' conduct on any particular IBO, he had been charged with the task of deriving a statistical measure of whether and how an aggregate population of IBOs had acted differently than could be expected in the rate and manner in which they left Petitioner and joined MonaVie.

giving rise to an inference that they had been reached by and acted upon Respondents' solicitation efforts.

To be sure, Petitioner's computation of damages was subject to challenge on the ground that there were a variety of other reasons, separate from Respondents' solicitation efforts, why an IBO might have elected to leave Petitioner's distribution network and sign up with MonaVie. Yet, Petitioner's expert sought to account for at least some of these factors in arriving at his estimate of damages, and Respondents do not contend that they lacked the opportunity to challenge his analysis on this ground. To the contrary, they thoroughly explored this matter in their questioning of Petitioner's expert, and they point to a variety of evidence introduced during the arbitration proceedings that, in their view, "shows that there were many reasons why IBOs left." (Respondents' Motion, Br. in Support at 36.) As the courts have confirmed, an expert's failure to account for all possible causes or factors goes only to the weight, and not the admissibility, of his testimony, *see Conwood Co.,* 290 F.3d at 794, and once this threshold of admissibility is met, it is up to the trier of fact to determine the weight to be given to the expert's testimony, *see, e.g., Fera,* 242 N.W.2d at 375-76; *Bero Motors,* 2006 WL 2312182, at *8. Accordingly, the arbitrator's award may not be disturbed, particularly under the highly deferential standard that governs this Court's review of the award.

### (b) The Imposition of Liability Upon the Respondent Wives

As Respondents point out, and Petitioner does not dispute, there was no evidence that the Respondent wives — Laurie Woodward, Terri Brady, and Amy Marks —

engaged in any solicitation activities in violation of Rule of Conduct 6.5.5.  Rather, it is clear that these three Respondents were charged with liability under the arbitrator's award solely by virtue of Rule of Conduct 3.2.1, which provides:

> A husband and wife are deemed to operate their IBs as a single entity regardless of whether both names are on the business.  Therefore, each is held accountable for the actions of the other so far as the Rules of Conduct are concerned.

(Petitioner's Response to Respondents' Motion, Ex. 5, ROC Rule 3.2.1.)  Respondents contend that the arbitrator acted beyond the bounds of the parties' contract by invoking this rule to impose liability upon the Respondent wives, where the acts giving rise to this liability — the solicitation efforts of the Respondent husbands — occurred after the termination of the contractual relationship between Petitioner and Respondents.  Upon the termination of this relationship, Respondents reason that the wives were no longer bound by Rule of Conduct 3.2.1, and therefore could not be held liable under this rule.

In light of the considerable latitude given to the arbitrator to interpret the parties' contract, the Court cannot say that the arbitrator acted wholly beyond the bounds of this agreement in imposing liability on the Respondent wives.  As observed earlier, the liability of the Respondent husbands was predicated on their violation of Rule of Conduct 6.5.5.  By the express terms of Rule of Conduct 3.2.1, a husband or wife is "held accountable for the actions of" his or her spouse "so far as the Rules of Conduct are concerned."  This rule is readily construed as imposing liability on both spouses for any violations of the Rules of Conduct committed by either spouse.  Moreover, if one spouse

may continue to be bound by a Rule of Conduct — here, Rule of Conduct 6.5.5 — and incur liability for conduct violating that rule after the termination of the Amway/IBO relationship, the Court fails to see why the other spouse cannot continue to be charged with joint liability for this violation under Rule of Conduct 3.2.1.[14]  At a minimum, the Court cannot say that the arbitrator acted wholly beyond the bounds of any tenable reading of the Rules of Conduct in reaching this conclusion.  Consequently, this aspect of the arbitrator's award may not be set aside.

### (c)    Undue Means

As their final challenge to the arbitrator's award, Respondents contend that the award should be set aside as "procured by . . . undue means," 9 U.S.C. § 10(a)(1), where one of Petitioner's experts, Vincent Thomas, advanced a theory of damages in another arbitration proceeding brought against Petitioner (the "Stewart Arbitration") that purportedly was inconsistent with the theory of damages advanced in the present arbitration proceeding by Petitioner's other damage expert, Dr. Wise, and where Petitioner allegedly concealed Mr. Thomas's inconsistent analysis from Respondents during the course of discovery in the present arbitration proceeding.  In response, Petitioner argues that it did not engage in improper conduct, but merely asserted a position in a discovery dispute that the arbitrator ultimately accepted.  Petitioner further

---

[14]Respondents characterize this as "vicarious" liability, under the premise that the Respondent wives are being held liable despite the absence of any wrongful act or breach of the Rules of Conduct.  Yet, it is wholly permissible for two or more parties, when entering into a contract with another party, to agree in their contract that each will bear joint liability for a breach by the other(s).  This is joint rather than vicarious liability.

contends that Respondents failed to exercise due diligence upon obtaining the deposition testimony of Mr. Thomas in the Stewart Arbitration, and that, in any event, Respondents have not shown that the introduction of this deposition testimony during the present arbitration proceeding would have materially altered the arbitrator's analysis or award. As explained below, the Court finds that Petitioner has the better of the argument on each of these prongs of the "undue means" inquiry.

To establish that the arbitrator's award should be vacated as procured by undue means, Respondents must show (i) clear and convincing evidence of fraud or misconduct by Petitioner, (ii) that this fraud or concealment could not have been discovered prior to or during the arbitration proceedings through the exercise of due diligence, and (iii) that the fraud or concealment materially related to an issue in the arbitration. *See International Brotherhood of Teamsters, Local 519 v. United Parcel Service, Inc.,* 335 F.3d 497, 503 (6th Cir. 2003); *Pontiac Trail Medical Clinic, P.C. v. PaineWebber, Inc.,* No. 92-1972, 1993 WL 288301, at *3 (6th Cir. July 29, 1993); *Barcume v. City of Flint,* 132 F. Supp.2d 549, 556 (E.D. Mich. 2001). As to the first prong of this standard, the courts have held that a showing of "undue means" under § 10 of the FAA "requir[es] some type of bad faith behavior," and that this language "clearly connotes behavior that is immoral if not illegal," as opposed to "mere sloppy or overzealous lawyering." *Pontiac Trail,* 1993 WL 288301, at *4 (internal quotation marks and citations omitted); *see also Barcume,* 132 F. Supp.2d at 556.

As noted, Respondents' claim of "undue means" here rests upon Petitioner's

purported "concealment" of the damage analysis Mr. Thomas performed on Petitioner's behalf in the Stewart Arbitration. This claim of "concealment," however, fails on a fundamental ground: namely, it does not appear that Petitioner ever had an obligation to produce this analysis at any point during the arbitration proceedings, such that it could be accused of "concealing" material that it had a duty to disclose. Rather, as discussed below, while Petitioner certainly resisted Respondents' efforts to obtain discovery relating to the Stewart Arbitration, this resistance was based upon permissible grounds that the arbitrator upheld in denying Respondents' request for this discovery.

Respondents evidently first became aware of Mr. Thomas's employment as an expert in the Stewart Arbitration when he was deposed in the present arbitration proceeding. When Respondents' counsel sought to inquire about the nature and substance of Mr. Thomas's expert analysis and report in the Stewart Arbitration, Petitioner's counsel instructed Mr. Thomas to answer only in general terms and not to disclose the substance of his report, on the ground that more detailed responses would run afoul of the confidentiality agreement governing the Stewart Arbitration. There is no indication in the record that Respondents sought a ruling from the arbitrator on the validity of these instructions and objections.

Instead, Respondents pursued other means of obtaining discovery relating to the Stewart Arbitration. First, they sought an order compelling Petitioner to produce a copy of the award issued in the Stewart Arbitration, but the arbitrator denied this request in a July 14, 2008 order. (*See* Respondents' Motion, Ex. 152, 7/14/2008 Order at ¶ 13.) Next,

Respondents issued a notice of deposition *duces tecum* in which they asked Petitioner to designate a witness who could testify on a number of matters, including the discovery provided by Petitioner in a federal suit arising from the Stewart Arbitration and the award issued in the Stewart Arbitration, and they further demanded that this designated witness produce (i) the documents provided by Petitioner to the opposing party in discovery in the suit arising from the Stewart Arbitration, to the extent these documents concerned "the issue of the enforceability of the Amway/Quixtar arbitration provisions in the Amway/Quixtar Rules of Conduct or registration forms," and (ii) the award issued in the Stewart Arbitration. (Petitioner's Response to Respondents' Motion, Ex. 93.) Again, Petitioner opposed these discovery efforts on the ground that the Stewart Arbitration was governed by a confidentiality agreement, and the arbitrator determined at a December 30, 2008 hearing that these matters were "neither relevant nor likely to lead to relevant evidence." (Respondents' Motion, Ex. 153, 12/30/2008 Arb. Hearing at 20-21.) There is no indication that Respondents pursued this matter any further in the arbitration proceedings.

Under this record, even assuming that the document Petitioner is accused of "concealing" — namely, Mr. Thomas's deposition testimony in the Stewart Arbitration — was encompassed within any of Respondents' discovery efforts outlined above,[15]

---

[15]This assumption, in the Court's view, is likely unwarranted. Respondents have not pointed to any discovery request they made during the arbitration proceedings in which they squarely sought the production of any discovery materials compiled during the Stewart Arbitration. Rather, it appears that they sought only the ***award*** in the Stewart Arbitration, as well as certain documents produced by Petitioner in the federal suit arising from this arbitration,

Respondents have failed to show (much less by clear and convincing evidence) that Petitioner engaged in any sort of misconduct or behaved in bad faith in failing to produce this material. Petitioner consistently took the position that the award in the Stewart Arbitration and the materials produced and exchanged in this arbitration proceeding were protected from disclosure by a confidentiality agreement. When Respondents sought to compel the production of the award in the Stewart Arbitration and other related materials, the arbitrator denied these requests. Respondents do not contend that Petitioner's appeal to a confidentiality agreement governing the Stewart Arbitration was untenable, frivolous, or wholly lacking in legal or factual support. Neither have they argued that the arbitrator abused her discretion or acted contrary to law in her rulings on Respondents' discovery requests, or that Petitioner misled the arbitrator into ruling in its favor on these disputes. Rather, Respondents simply invite the Court to speculate that Petitioner invoked the Stewart Arbitration confidentiality agreement as a subterfuge to prevent the disclosure of material that would undercut its theory of damages in the present arbitration proceeding. Nothing in the record supports this inference, much less supplies the requisite clear and convincing evidence of an affirmative act of concealment or other misconduct. At most, Petitioner and its counsel could be accused of "overzealous lawyering" in their appeals to

---

but only as they related to the issue of the enforceability of Petitioner's arbitration agreement. Despite Respondents' accusations of concealment, they notably fail to direct the Court's attention to any discovery request during the arbitration proceedings that plainly would have encompassed Mr. Thomas's deposition testimony or expert analysis in the Stewart Arbitration, nor have they even attempted to put forward an argument that one of their discovery requests should be construed as encompassing these materials.

the Stewart Arbitration confidentiality agreement, but this, as explained earlier, "does not constitute 'undue means.'" *Pontiac Trail,* 1993 WL 288301, at *4.

Under comparable circumstances, the courts have held that a party's assertion of objections to a discovery request does not rise to the level of misconduct that could sustain a finding of "undue means" under § 10 of the FAA. In *Bauer v. Carty & Co.,* No. 06-5390, 246 F. App'x 375, 376-77 (6th Cir. Sept. 4, 2007), for example, plaintiff Ty Kevin Bauer sought to vacate an arbitration award on the ground that defendant Carty & Company had fraudulently procured the award by withholding documents during discovery in the arbitration proceeding. Although Bauer argued that defendant Carty "must have acted in bad faith" because the documents at issue "were responsive to . . . valid document requests but were not produced," the court found that this lack of production was merely "consistent with bad faith," and that "this inference alone is not clear and convincing evidence of bad faith." *Bauer,* 246 F. App'x at 378-79. The court further noted that Carty had objected to the production of the documents at issue on grounds of relevance, and it found that this "relevance objection may have had merit." 246 F. App'x at 379. Under these circumstances, the court held that "[t]he narrow interpretation of a document request and withholding of a document based upon a potentially meritorious objection do not constitute clear and convincing evidence of bad faith or immoral conduct required for fraud or undue means." 246 F. App'x at 379-80.

Similarly, in *Pontiac Trail,* 1993 WL 288301, at *1, the party seeking to vacate the arbitrator's award, plaintiff Pontiac Trail Medical Clinic, made a request for documents

47

during the arbitration proceedings, but defendant PaineWebber objected to these requests on grounds of relevancy, and the arbitrators denied Pontiac Trail's discovery requests. Pontiac Trail contended that PaineWebber "obtained the [arbitration] award fraudulently by withholding relevant documents," but the Sixth Circuit disagreed, finding that "Pontiac Trail has cited no authority suggesting that allegedly defective objections and misleading discovery responses to prehearing discovery requests can constitute fraud within the meaning of § 10(a)(1) when, as here, the arbitrators declined to order production of the requested documents and sustained PaineWebber's objections to their production." 1993 WL 288301, at *3-*4. The court further concluded that Pontiac Trail had failed to establish that the award was procured by undue means, reasoning that a party does not exhibit bad faith behavior merely by advancing even a "meritless" position in a discovery dispute. 1993 WL 288301, at *4-*5 (internal quotation marks and citation omitted).[16]

Respondents also have failed to establish the remaining two prongs of the "undue means" standard. First, as to the "due diligence" prong of this standard, the record reveals that Respondents obtained an unredacted transcript of Mr. Thomas's deposition testimony and report from the Stewart Arbitration on July 7, 2009, before the arbitrator issued her award in the present proceeding. Yet, they did not seek to reopen the

---

[16]While Respondents characterize the decision in *Pontiac Trail* as turning solely upon plaintiff Pontiac Trail's lack of due diligence in seeking to obtain the documents at issue from other sources, (*see* Respondents' Reply Br. at 19-20), it is clear from the above-quoted passages that the court in that case also found that PaineWebber had not engaged in fraud or misconduct solely by virtue of having objected to Pontiac Trail's discovery requests.

arbitration record or otherwise bring this new information to the arbitrator's attention before she issued her July 24, 2009 interim award or August 7, 2009 final award. Such inaction does not bespeak due diligence.

Finally, it is not evident that Mr. Thomas's deposition testimony, if introduced during the arbitration proceedings, would have materially altered the record or the outcome. Respondents' claim of materiality rests upon Mr. Thomas's calculation of lost profits in the Stewart Arbitration, with Thomas opining that the income of the plaintiff IBOs in that case would have fallen to a flattened, "terminal" level after five years. (*See* Respondents' Motion, Ex. 157, Thomas Dep. at 108-12.) In the present arbitration proceeding, in contrast, Petitioner's expert, Dr. Wise, projected Petitioner's lost profits due to IBO defections to competitor MonaVie by reference to a 20-year period.[17]

Yet, as Petitioner points out, Mr. Thomas's selection of a five-year lost-profits curve in the Stewart Arbitration did not rest upon generalized notions of the average profit-making "life span" of an IBO, but instead was based upon the specific facts of that case. (*See id.* at 109, 114-15.) Indeed, Thomas specifically denied at his deposition that he had "assumed" a five-year period of profit-making, or that he had simply relied upon information indicating that the average life span of an IBO is two to five years, and he

---

[17]As Petitioner points out, while Mr. Thomas provided expert testimony in both the present arbitration proceeding and the Stewart Arbitration, it was Dr. Wise, and not Mr. Thomas, who supplied the purportedly inconsistent computation of damages in this case. Thus, even if Mr. Thomas's deposition testimony in the Stewart Arbitration had been introduced in the present arbitration proceeding, it could only have been used to impeach the testimony of Dr. Wise, and not Mr. Thomas's own testimony.

instead insisted that his analysis was based on the historical figures and actual experiences of the IBOs at issue. (*See id.* at 108-09, 111-12, 114.) Under these circumstances, it cannot be said that any effort to impeach Dr. Wise based on Mr. Thomas's fact-specific testimony in the Stewart Arbitration would have materially altered the arbitrator's assessment of Dr. Wise's testimony, particularly where Respondents vigorously cross-examined Dr. Wise on his 20-year projections of lost profits, and where they offered the testimony of their own damage expert to refute this and other aspects of Dr. Wise's analysis.

## IV.  CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Petitioner's October 21, 2009 motion to confirm arbitration award (docket #30) is GRANTED.  IT IS FURTHER ORDERED that Respondents' November 6, 2009 motion to vacate arbitration award (docket #39) is DENIED.


s/Gerald E. Rosen
Chief Judge, United States District Court

Dated: September 30, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record on October 4, 2010, by electronic and/or ordinary mail.

s/Ruth A. Gunther
Case Manager